1   KERSHAW TALLEY BARLOW PC
    William A. Kershaw (SBN 57486)
2   401 Watt Avenue, Suite 1
    Sacramento, CA 95864
3   Phone: 916-779-7000
    Fax: 916-244-4829
4   Email: bill@ktblegal.com

5   FLEMING, NOLEN & JEZ, LLP
    George M. Fleming (Pro Hac Vice forthcoming)
6   Texas State Bar No. 07123000
    Rand P. Nolen (Pro Hac Vice forthcoming)
7   Texas State Bar No. 00788126
    2800 Post Oak Blvd., Suite 4000
8   Houston, TX 77056
    Phone: 713-621-7944
9   Fax: 713-621-9638
    george_fleming@fleming-law.com
10  rand_nolen@fleming-law.com

11  *Counsel for Plaintiffs*

12                    **UNITED STATES DISTRICT COURT**

13                  **NORTHERN DISTRICT OF CALIFORNIA**

14

15   EMILY HANSEN, SOMMER MILHOUS, and   )   Case No.:
     ANDREW GUTIERREZ, individually and on )
16   behalf of all others similarly situated, )   **CLASS ACTION COMPLAINT**
                                            )
17                    Plaintiff(s),        )
                                            )
18        vs.                              )   <u>JURY TRIAL DEMANDED</u>
                                            )
19   WALMART, INC.,                        )
                                            )
20                    Defendant.           )
                                            )
21   _____ )

22          EMILY HANSEN, SOMMER MILHOUS, and ANDREW GUTIERREZ, ("Plaintiffs"), on

23   behalf of themselves and all others similarly situated, file this Class Action Complaint ("CAC")

24   against Defendant Walmart, Inc. ("Walmart"), and in support states the following:

25                          <u>**NATURE OF THE ACTION**</u>

26          1.      Nasal decongestants are over-the-counter medications that are marketed to alleviate

27   sinus pressure and sinus congestion.

28          2.      Defendant has made millions of dollars selling its nasal decongestant products.

Defendant's products include the following oral tablets, caplets, powder, and/or syrup: (1) Equate Children's Cold and Cough, (2) Equate Daytime Cold & Nighttime Cold & Cough Multi-Symptoms Severe Relief Powder, (3) Equate Nighttime Vapor Ice Severe Cold and Flu Coated Caplets, (4) Equate Daytime Non-Drowsy Vapor Ice Severe Cold and Flu Coated Caplets, and (5) Equate Maximum Strength Daytime Cold & Flu Softgels with Acetaminophen (collectively, the "Products").

3.      Defendant markets the Products as having the ability to provide relief to "Sinus Pressure," "Sinus Congestion," "Nasal Congestion," and/or "Nasal Swelling."

4.      Defendant attributes the Products' ability to provide nasal decongestion relief to the inclusion of one active ingredient: Phenylephrine ("PE").

5.      PE however, is ineffective at providing nasal decongestion relief when it is taken orally.

6.      Indeed, on September 12, 2023, an advisory panel to the U.S. Food & Drug Administration ("FDA") unanimously agreed (16-0) that oral PE is not effective at relieving nasal congestion.

7.      Accordingly, Defendant's marketing and advertising concerning the Products is false, misleading, and likely to deceive the public.

8.      Plaintiffs assert claims on behalf of themselves and similarly situated purchasers of Defendant's Products for violations of the California Consumers Legal Remedies Act ("CLRA"), Civil Code §§ 1750, et seq., Unfair Competition Law ("UCL"), Bus. & Prof. Code §§ 17200, et seq., False Advertising Law ("FAL"), Bus. & Prof. Code §§ 17500, et seq., breach of implied warranty of merchantability, unjust enrichment, and negligent misrepresentation.

## THE PARTIES

9.      Plaintiff Emily Hansen is a resident of Santa Rosa, California, has an intent to remain there, and is therefore a domiciliary of California.

10.      Plaintiff Sommer Milhous is a resident of Browns Valley, California, has an intent to remain there, and is therefore a domiciliary of California.

11.      Plaintiff Andrew Gutierrez is a resident of Patterson, California, has an intent to

1    remain there, and is therefore a domiciliary of California.

2        12.    Plaintiffs purchased various oral Equate products in California at Walmart

3    containing phenylephrine hydrochloride for nasal decongestant relief multiple times. Before

4    purchasing the Product, Plaintiffs reviewed information about the Product, including the

5    representation that the Product would be able to provide nasal congestion relief. When reviewing

6    the Product label, disclosures, warranties, and marketing materials, Plaintiffs understood them as

7    representations and warranties by Defendant that the Product would be able to provide nasal

8    decongestion relief.

9        13.    Plaintiffs relied on Defendant's representations and warranties in deciding to

10   purchase the Product over other nasal decongestant products. Accordingly, Defendant's

11   representations and warranties were part of the basis of the bargain, in that they would not have

12   purchased the Product on the same terms had they known Defendant's representations were not

13   true.

14       14.    Contrary to the representations on the Products' marketing materials, the Products

15   were not able to provide nasal decongestion relief. Plaintiffs therefore did not receive the benefit of

16   their bargain.

17       15.    Plaintiffs continue to be exposed to Defendant's marketing materials for these

18   ineffective Products. Plaintiffs continue to encounter the Products on display for sale to consumers

19   at retail businesses where they regularly shop. Plaintiffs would purchase Defendant's Products

20   again in the future if they were assured that Defendant's Products had been reformulated using

21   generally recognized as safe and effective ("GRASE") ingredients that are proven effective for

22   decongestant relief as advertised by Defendant.

23       16.    Defendant Walmart, Inc. is an Arkansas corporation with its headquarters and

24   principal place of business at 702 SW 8th Street, Dept 8687 #0555, Bentonville, Arkansas 72716.

25   Walmart manufactures, markets, advertises, labels, distributes, and sells phenylephrine products

26   under its Equate product line. Walmart may be served via its registered agent, C T Corporation

27   System, 330 N. Brand Blvd, Ste. 700, Glendale, CA 91203.

28

**JURISDICTION AND VENUE**

17.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are over 100 members of the putative class, and Plaintiffs, as well as most members of the proposed class, are citizens of states different than Defendant.

18.    This Court has personal jurisdiction over the Defendant because the Defendant is authorized to conduct business in California, such that Defendant has significant, continuous, and pervasive contacts with the State of California. Moreover, Defendant has purposefully availed itself of the laws and benefits of doing business in California, and Plaintiffs' claims arise out of the Defendant's forum-related activities. Defendant has marketed, promoted, distributed, and sold the Products in California.

19.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant transacts significant business within this District and because Plaintiffs purchased and used the Products in this District.

**FACTUAL ALLEGATIONS**

20.    The market for products that allegedly relieve nasal congestion is worth over $2 billion annually and includes over 250 products.

21.    Defendant Walmart marketed and sold the Products to consumers in California and across the United States as an effective nasal decongestant.

22.    The main so-called "active ingredient" in the Products is phenylephrine hydrochloride ("PE" or "phenylephrine"). However, "[n]o support has been found in the literature in the public domain for the efficacy of PE as a nasal decongestant when administered orally."[1]

23.    Another prominent active ingredient found in OTC cold and cough medicines (but not in the Products at issue in this litigation) is pseudoephedrine hydrochloride ("PDE" or

---

[1] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2000711/ (last viewed Oct. 20, 2023).

1    "pseudoephedrine").[2] Unlike PE, "[c]linical studies of PDE provide sufficient information to
2    support the efficacy" of PDE in OTC dosage amounts.[3]

3        24.    Unfortunately, Pseudoephedrine hydrochloride can be converted into
4    methamphetamine. In 2006, the Combat Methamphetamine Act banned over-the-counter sales of
5    cold medicines that contain the ingredient pseudoephedrine. Since such time, the sale of cold
6    medicine containing pseudoephedrine is limited to behind the counter. The amount of
7    pseudoephedrine that an individual can purchase each month is limited and individuals are required
8    to present photo identification to purchase products containing pseudoephedrine. In addition, stores
9    are required to keep personal information about purchasers for at least two years.[4]

10       25.    This has translated into increased sales for decongestants that contain PE. Last year,
11   242 million packages or bottles of phenylephrine products were sold, resulting in $1.76 billion in
12   sales. In contrast, only a little over 50 million packages of pseudoephedrine were sold that same
13   year, resulting in $542 million in sales.[5]

14   ***The Financial Significance of a GRASE Designation for Defendant***

15       26.    As discussed below, the FDA has previously designated PE as generally recognized
16   as safe and effective despite the lack of peer-reviewed scientific evidence to support PE's efficacy
17   as an oral decongestant. However, after a two-day meeting on September 11-12, 2023, the FDA
18   concluded that the scientific data do not support a GRASE designation for PE as an ingredient in
19   cough and cold OTC medications.

20       27.    An FDA GRASE designation permits pharmaceutical products companies and
21   retailers with store brands (like Defendant) to market products (like Equate) that contain GRASE
22   ingredients directly to consumers as OTC medications.

23

24

---

25   [2]https://www.mayoclinic.org/drugs-supplements/pseudoephedrine-oral-route/side-effects/drg-20067942    (last    viewed
     Oct. 20, 2023).

26   [3] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2000711/ (last viewed Oct. 20, 2023).

27   [4] https://www.fda.gov/drugs/information-drug-class/legal-requirements-sale-and-purchase-drug-products-containing-
     pseudoephedrine-ephedrine-and (last viewed Oct. 20, 2023).

28   [5] https://www.webmd.com/drug-medication/news/20230913/popular-otc-decongestant-ineffective (last viewed Oct. 20,
     2023).

28.    "OTC medicines do not require a prescription and are typically freely available from many kinds of retailers."[6] In the United States alone, "there are more than 750,000 retail outlets that sell OTC products."[7]

29.    In 2022, PE versions of oral cough and cold decongestant OTC medications accounted for about 80% of "the $2.2 billion market," while PDE versions made up the other 20%.[8]

***Defendant's Deceptive Marketing Regarding the Efficacy of its PE OTC Products***

30.    In the many years preceding the filing of this Complaint, Defendant has advertised, and continue to advertise, PE as an effective decongestant that relieves nasal congestion and sinus pressure associated with colds, allergies, and other respiratory conditions, even though Defendant knew or should have known that the current scientific data demonstrates that oral PE is ineffective as a nasal decongestant.

31.    As a result of its aggressive and misleading marketing tactics, PE Products "generated nearly $1.8 billion in sales last year alone."

32.    Over the many years preceding the filing of this Complaint, Defendant has made extensive claims in their marketing materials concerning the efficacy of their Products.

33.    For Equate Children's Cold and Cough, these claims include:

- Equate Children's Cold and Cough relieves cold and allergy symptoms, including nasal congestion, runny nose, sneezing, coughing and itchy, watery eyes. Each dose calms allergy symptoms and temporarily restores freer breathing through the nose.

- Cough and Cold Relief: This children's cold medicine relieves cold and allergy symptoms, such as nasal congestion, runny nose, sneezing, cough and itchy, watery eyes.

---

[6] https://www.goodrx.com/healthcare-access/medication-education/otc-isnt-always-cheaper-when-it-pays-to-get-a-prescription (last visited Oct. 20, 2023).

[7] https://www.chpa.org/about-consumer-healthcare/research-data/otc-sales-statistics (last visited Oct. 20, 2023).

[8] https://www.pbs.org/newshour/health/popular-nasal-decongestant-doesnt-actually-relieve-congestion-fda-advisers-say (last viewed Oct. 20, 2023).

- Clears Stuffy Nose: Equate Children's Cold and Cough calms allergy symptoms and temporarily restore freer breathing through the nose.



34.    For Equate Daytime Cold & Nighttime Cold & Cough Multi-Symptom Severe Relief Powder, these claims include:

- Equate Daytime Cold & Nighttime Cold & Cough Severe Relief Powder works hard to provide you with the relief you need to power through your cold. This multi-symptom day and night dissolving powder cold medication packet combo pack is formulated with the around-the-clock essentials you need to overcome your symptoms. Both the daytime and nighttime formulas act as pain relievers, fever reducers, cough suppressants, and nasal decongestants that temporarily relieve nasal congestion, sore throat pain, coughing, body aches, fever, and headaches, and the nighttime medication goes a step farther to also temporarily relieve runny noses and sneezing.

- Temporarily relieves these symptoms due to a cold: minor aches and pains, cough due to minor throat and bronchial irritation, headache, nasal and sinus congestion, temporarily reduces fever, and minor sore throat pain.



35.     For Equate Nighttime Vapor Ice Severe Cold and Flu Coated Caplets, these claims include:

- Compare to Vicks NyQuil Severe+ VapoCOOL active ingredients. Rely on Equate Nighttime Vapor Ice Severe Cold and Flu Coated Caplets for maximum strength relief of multiple cold and flu symptoms: minor aches and pains, fever, nasal congestion and sinus pressure, sneezing, runny nose, and cough. Relieve cold and flu symptoms with one dose containing pain reliever, fever reducer, cough suppressant, antihistamine, and nasal decongestant. Small but powerful, these vapor ice caplets help provide relief for four hours. Take control of your severe cold and flu symptoms with Equate Nighttime Vapor Ice Severe Cold and Flu Coated Caplets.



36.     For Equate Daytime Non-Drowsy Vapor Ice Severe Cold and Flu Coated Caplets,

these claims include:

- Compare to Vicks DayQuil Severe+ VapoCOOL active ingredients. Rely on Equate Daytime Vapor Ice Severe Cold and Flu Coated Caplets for maximum strength relief of multiple cold and flu symptoms: minor aches and pains, fever, nasal congestion and sinus pressure, sneezing, runny nose, and cough. Relieve cold and flu symptoms with one dose containing pain reliever, fever reducer, cough suppressant, antihistamine, and nasal decongestant. Small but powerful, these vapor ice caplets help provide relief for four hours. Take control of your severe cold and flu symptoms with Equate Daytime Vapor Ice Severe Cold and Flu Coated Caplets.

- This product contains a pain reliever/fever reducer, cough suppressant, antihistamine, and nasal decongestant.

- Temporarily relieves common cold and flu symptoms such as nasal congestion, sinus congestion and pressure, runny nose and sneezing, minor aches and pain, sore throat, and cough.



37.     For Equate Maximum Strength Daytime Cold & Flu Softgels with Acetaminophen, these claims include:

- Don't let a cold get you down with Equate Maximum Strength Daytime Cold & Flu

Softgels. These softgels are formulated with four strong medicines: acetaminophen, a pain reliever and fever reducer; a cough suppressant; guaifenesin, an expectorant; and phenylephrine HCl, a nasal decongestant. Together, these medicines relieve cold and flu symptoms such as headache, fever, sore throat, minor aches and pains, nasal and sinus congestion and pressure, chest congestion, and cough. They promote nasal and sinus drainage by thinning and loosening mucus for more regular breathing. These powerful softgels also help loosen phlegm and thin bronchial secretions to rid the bronchial passageways of bothersome mucus and make coughs more productive. This box comes with 24 daytime softgels so that you can get on the road to healing. Relieve your cold and flu symptoms with Equate Maximum Strength Daytime Cold & Flu Softgels.

- Contains acetaminophen, dextromethorphan, guaifenesin, and phenylephrine HCl.
- Temporarily relieves cold and flu symptoms such as headache, fever, sore throat, minor aches and pains, nasal and sinus congestion and pressure, chest congestion, and cough.



38.     By representing that the Products are effective remedies for "Sinus Pressure," "Sinus Congestion," "Nasal Congestion," and "Nasal Swelling," Defendant induced reasonable consumers, such as Plaintiffs and the proposed class members into believing that the Products were effective at providing nasal decongestion relief. Those representations, however, are false and misleading, as set forth in greater detail below.

*The Products' Use of Phenylephrine*

39.    Defendant's Products all attribute the ability to provide nasal decongestion relief to one active ingredient: PE.

40.    Defendant does not attribute nasal decongestant relief to any other ingredient in the Products.

*Phenylephrine Does Not Provide Nasal Decongestant Relief When Taken Orally*

41.    PE is ineffective at providing nasal decongestant relief when taken orally. All available scientific authorities support this conclusion.

42.    For example, on May 1, 2006, two professors at the University of Florida, Dr. Leslie Hendeles, PharmD Professor, Pharmacy and Pediatrics, and Dr. Randy Hatton, PharmD FCCP BCPS Clinical Professor, Department of Pharmacotherapy and Translational Research College of Pharmacy published a letter in Journal of Allergy and Clinical Immunology titled: Oral phenylephrine: An ineffective replacement for pseudophedrine?[9] The letter questioned the effectiveness of PE for nasal congestion based upon the results of multiple double blind, placebo-controlled studies, that show PE was no more effective than placebo in reducing nasal airway resistance. Moreover, the letter notes that the studies relied on by the FDA to approve PE were unpublished, manufacturer-sponsored studies conducted by commercial testing laboratories.

43.    On February 1, 2007, three professors from the University of Florida, Dr. Leslie Hendeles, PharmD Professor, Pharmacy and Pediatrics, Dr. Randy Hatton, PharmD FCCP BCPS Clinical Professor, Department of Pharmacotherapy and Translational Research College of Pharmacy, and Almut G. Winterstein (PhD, Assistant Professor, Department of Healthcare Administration) filed a Citizens Petition with the FDA concerning PE drugs.[10]

44.    As a result of the 2007 Citizens Petition, the FDA's Nonprescription Drugs Advisory Committee met on December 14, 2007, and concluded that the products could continue to be sold, but 9 of 12 of the committee members voted that "new studies on response to higher doses were

---

[9] https://www.jacionline.org/article/S0091-6749(06)00633-6/fulltext (last accessed Oct. 20, 2023).

[10] https://www.regulations.gov/docket/FDA-2007-P-0108/document (last accessed Oct. 20, 2023).

-11-
CLASS ACTION COMPLAINT

1    required."[11]

2        45.    Scherling-Plough Pharmaceuticals responded to the FDA's Nonprescription Drugs

3    Advisory Committee by conducting a multicenter, phase 2, trial among 539 adults with seasonal

4    allergic rhinitis. The results of the study revealed no significant differences between placebo and

5    active treatment groups.[12]

6        46.    In addition, McNeil Consumer Healthcare conducted a pharmacokinetic, safety and

7    cardiovascular tolerability study of phenylephrine. This study revealed no difference in safety and

8    cardiovascular endpoints between placebo and 10, 20, and 30 mg of phenylephrine even though

9    phenylephrine was rapidly absorbed and systemic exposure increased disproportionally with

10   increasing dose.[13] Phenylephrine, which primarily stimulates alpha-1 adrenergic receptors in the

11   heart, respiratory tract, and other organs, did not induce expected physiological changes, such as

12   increases in pulse and blood pressure, commonly linked to alpha-1 adrenergic stimulation even at

13   doses up to three times higher than the 10 mg dose marketed by Defendant as an effective nasal

14   decongestant.[14] In other words, even supratherapeutic doses of phenylephrine may be insufficient to

15   stimulate alpha-1 adrenergic receptors enough to elicit a physiological response.

16       47.    On November 4, 2015, another Citizens Petition was filed by two professors at the

17   University of Florida, Dr. Leslie Hendeles, PharmD Professor, Pharmacy and Pediatrics, and Dr.

18   Randy Hatton, PharmD FCCP BCPS Clinical Professor, Department of Pharmacotherapy and

19   Translational Research College of Pharmacy. The petition asked the FDA "to remove oral

20   phenylephrine from the Final Monograph for OTC nasal decongestant products."[15] Specifically, the

21   petition asked the FDA to remove Phenylephrine and to remove phenylephrine bitartrate, "both

22

23   _____

24   [11] https://www.jaci-inpractice.org/article/S2213-2198(15)00318-9/fulltext (last accessed Oct. 20, 2023).

25   [12] https://truthinadvertising.org/wp-content/uploads/2023/02/Hatton-Hendeles-2015-Citizens-Petition-re-oral-phenylephrine.pdf (last accessed Oct. 20, 2023).

26   [13] Gelotte CK, Zimmerman BA. Pharmacokinetics, safety, and cardiovascular tolerability of phenylephrine HCl 10, 20,
27   and 30 mg after a single oral administration in healthy volunteers. Clin Drug Investig. 2015 Sep;35(9):547-58.

28   [14] See id.

     [15] https://truthinadvertising.org/wp-content/uploads/2023/02/Hatton-Hendeles-2015-Citizens-Petition-re-oral-phenylephrine.pdf (last accessed Oct. 20, 2023).

1  individually and in combination drug products in an effervescent dosage form."[16]

2      48.    According to the 2015 Citizens Petition, "[t]wo additional studies publitheyd in 2009

3  provide further evidence of the absence of a decongestant effect from the FDA-approved

4  nonprescription dose of 10mg," and "PE was not significantly different from placebo in the mean

5  change in subjective nasal congestion scores whereas pseudoephedrine, a positive control in the

6  study, decreased congestion significantly greater than placebo and PE."[17]

7  ***The FDA Advisory Panel's Recent Vote on PE***

8      49.    Recently, "[t]he FDA held a Non-prescription Drug Advisory Committee meeting…

9  to discuss the effectiveness of oral phenylephrine as an active ingredient in over-the-counter (OTC)

10  cough and cold products that are indicated for the temporary relief of congestion, both as a single

11  ingredient product and in combination with other ingredients."[18]

12      50.    In doing so, the Panel referenced numerous studies demonstrating that PE is not

13  effective for treating nasal congestion when taken orally.

14      51.    As a result, the Panel concluded that "the current scientific data do[es] not support

15  that the recommended dosage of orally administered phenylephrine is effective as a nasal

16  decongestant."[19]

17      52.    In fact, the Panel members voted unanimously (16-0) that PE drugs were ineffective

18  when taken orally.

19  ***Misbranded Drugs Are Illegal to Sell***

20      53.    Section 502(a)(1) of the Federal Food, Drug and Cosmetic Act (FFDCA)[20] states that

21  a drug is misbranded if its labeling proves false or misleading in any particular. Section 201(n) of

22

23

24  [16] *Id.*

25  [17] *Id.*

26  [18] https://www.fda.gov/drugs/drug-safety-and-availability/fda-clarifies-results-recent-advisory-committee-meeting-oral-
27  phenylephrine (last accessed Oct. 20, 2023).

[19] https://www.fda.gov/drugs/drug-safety-and-availability/fda-clarifies-results-recent-advisory-committee-meeting-oral-
28  phenylephrine (last accessed Oct. 20, 2023).

[20] Codified as 21 C.F.R. 352(a)(1).

1  the FFDCA[21] further states that if a drug is alleged to be misbranded because the labeling or

2  advertising is misleading, then in determining whether the labeling or advertising is misleading, one

3  must consider not just the representations made but also the failure to disclose material facts,

4  especially regarding the drug's consequences under its prescribed or customary conditions of use.

5       54.    Defendant's products containing phenylephrine are misbranded under Section 502(a)

6  of the FFDCA as described more fully in paragraphs 31-39 *supra*.

7       55.    Defendant's products containing phenylephrine are misbranded under Section 201(n)

8  of the FFDCA because its labeling and advertising with respect to these products are misleading

9  under Section 201(n) of the FFDCA. Specifically, Defendant has continued to represent that its

10 products containing phenylephrine are effective nasal decongestants notwithstanding the absence of

11 any supporting scientific evidence nor disclosure of scientific evidence to the contrary.

12      56.    Any drug product not manufactured in accordance with cGMPs is deemed

13 "adulterated" or "misbranded" and may not be distributed or sold in the United States. See 21

14 U.S.C. §§ 331(a), 351(a)(2)(B). States have enacted laws adopting or mirroring these federal

15 standards.

16      57.    FDA regulations require a drug product manufacturer to have "written procedures for

17 production and process control designed to assure that the drug products have the identity, strength,

18 quality, and purity they purport or are represented to possess." 21 C.F.R. § 211.100.

19      58.    A drug product manufacturer's "[l]aboratory controls shall include the establishment

20 of scientifically sound and appropriate specifications, standards, sampling plans, and test procedures

21 designed to assure that components, drug product containers, closures, in-process materials,

22 labeling, and drug products conform to appropriate standards of identity, strength, quality, and

23 purity." 21 C.F.R. § 211.160.

24      59.    "Laboratory records shall include complete data derived from all tests necessary to

25 assure compliance with established specifications and standards, including examinations and

26 assays" and a "statement of the results of tests and how the results compare with established

27 standards of identity, strength, quality, and purity for the component, drug product container,

28

---

[21] Codified as 21 C.F.R. 321(n).

1  closure, in-process material, or drug product tested." 21 C.F.R. § 211.194(a)(6).

2  60.    Defendant could have avoided any potential for misrepresenting the quality

3  characteristics that it represented the Products possessed by testing the effectiveness of PE in the

4  Products for the purported claims on the Products' labeling.

5  61.    The ineffectiveness of PE in the Products renders the Products both adulterated and

6  misbranded under the FFDCA. The Products are adulterated because they are "drug[s] and the

7  methods used in, or the facilities or controls used for, its manufacture, processing, packing, or

8  holding do not conform to or are not operated or administered in conformity with current good

9  manufacturing practice to assure that such drug meets the requirements of this chapter as to safety

10  and has the identity and strength, and meets the quality and purity characteristics, which it purports

11  or is represented to possess." 21 U.S.C. § 351(a)(1).

12  62.    The Products are misbranded because their labeling is "false" and "misleading"

13  because it does not alleviate nasal congestion and/or sinus relief. 21 U.S.C. § 352(a)(1).

14  63.    A product that is "adulterated" or "misbranded" cannot legally be manufactured,

15  advertised, distributed, or sold. 21 U.S.C. § 331(a). Adulterated and misbranded products thus have

16  no economic value and are legally worthless.

17  64.    As alleged herein, Defendant has violated the FFDCA, California's Consumers

18  Legal Remedies Act ("CLRA"), California's Unfair Competition Law ("UCL"), California's False

19  Advertising Law ("FAL"), and consumer protection statutes. Defendant engaged in fraudulent,

20  unfair, deceptive, misleading, and/or unlawful conduct stemming from its misrepresentations and

21  omissions surrounding the quality and purity characteristics affecting the Products.

22  65.    If Defendant had disclosed to Plaintiffs and putative Class Members that the

23  Products do not have the quality characteristics that it purports or is represented to possess,

24  Plaintiffs and putative Class Members would not have purchased the Products, or they would have

25  paid less for the Products.

26  66.    As a seller of an OTC drug product, Defendant had and has a duty to ensure that its

27  Products have the identity and strength and meets the quality characteristics that it purports or is

28  represented to possess, including through regular testing, especially before the Products are injected

into the stream of commerce for consumers to use on their bodies. But based on the FDA Panel's conclusions set forth above, Defendant made no reasonable effort to test its Products for the nasal decongestant claims it made. Nor did it disclose to Plaintiffs in any advertising or marketing that the Products did not conform to the nasal decongestant claims it purported or represented to possess. To the contrary, Defendant represented and warranted, expressly and impliedly, that the Products were of merchantable quality, complied with federal and state law, and did have the identity and strength and meet the quality characteristics that it purports or is represented to possess.

***Injuries to Plaintiffs and Class Members***

67.     When Plaintiffs purchased Defendant's Products, Plaintiffs did not know, and had no reason to know, that Defendant's Products did not have the identity and strength and meet the quality characteristics that it purported to possess (i.e., the ability to alleviate nasal congestion). Not only would Plaintiffs not have purchased Defendant's Products had Plaintiffs known the Products did not have the ability to alleviate nasal congestion, but Plaintiffs would also not have been capable of purchasing them if Defendant had done as the law required and tested the Products for its ability to alleviate nasal congestion.

68.     Consumers lack the ability to test or independently ascertain or verify whether a product has the identity and strength and meets the quality characteristics that it purports to possess, especially at the point of sale, and therefore must rely on Defendant to truthfully and honestly report what the Products can do on the Products' packaging or labels.

69.     Further, given Defendant's position in the retail market as an industry leader, Plaintiffs and reasonable consumers trusted and relied on Defendant's representations and omissions regarding the ability to alleviate nasal congestion in the Products.

70.     Yet, when consumers look at the Products' packaging, the Products are represented as having the ability to alleviate nasal congestion. This leads reasonable consumers to believe the Products can alleviate nasal congestion.

71.     No reasonable consumer would have paid any amount for products that do not have the ability to alleviate nasal congestion, when the Products are marketed to consumers as having the ability to alleviate nasal congestion.

72.     Thus, if Plaintiffs and Class members had been informed that Defendant's Products do not have the ability to alleviate nasal congestion, they would not have purchased or used the Products, or would have paid significantly less for the Products, making such omitted facts material to them.

73.     Defendant's false, misleading, omissions, and deceptive misrepresentations regarding the Products' ability to alleviate nasal congestion are likely to continue to deceive and mislead reasonable consumers and the public, as it has already deceived and misled Plaintiffs and the Class Members.

74.     Plaintiffs and Class members bargained for a Product that can alleviate nasal congestion. Plaintiffs and Class members were injured by the full purchase price of the Products because the Products are worthless, as they do not have the ability to alleviate nasal congestion, and Defendant failed to warn consumers of this fact. Such illegally sold products are worthless and have no value.

75.     As alleged above, the Products purchased by Plaintiffs and Class members do not have the ability to alleviate nasal congestion, despite the Products' representations to the contrary.

76.     Plaintiffs and Class members are further entitled to statutory and punitive damages, attorneys' fees and costs, and any further relief this Court deems just and proper.

**TOLLING OF THE STATUTE OF LIMITATIONS,**
**FRAUDULENT CONCEALMENT, EQUITABLE TOLLING,**
**AND CONTINUING VIOLATIONS**

77.     Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the claims sued upon herein until immediately prior to commencing this civil action.

78.     Any applicable statutes of limitation have been tolled by Defendant's affirmative acts of fraudulent concealment and continuing misrepresentations, as the facts alleged above reveal.

79.     Because of the self-concealing nature of Defendant's actions and their affirmative acts of concealment, Plaintiffs and the Classes assert the tolling of any applicable statutes of limitations affecting the claims raised herein.

80.     Defendant continues to engage in the deceptive practice, and consequently, unwary consumers are injured on a daily basis by Defendant's unlawful conduct. Therefore, Plaintiffs and

the Classes submit that each instance that Defendant engaged in the conduct complained of herein and each instance that a member of any Class purchased Defendant's Product constitutes part of a continuing violation and operates to toll the statutes of limitation in this action.

81.    Defendant is estopped from relying on any statute of limitations defense because of its unfair or deceptive conduct.

82.    Defendant's conduct was and is, by its nature, self-concealing. Still, Defendant, through a series of affirmative acts or omissions, suppressed the dissemination of truthful information regarding its illegal conduct, and actively has foreclosed Plaintiffs and the Classes from learning of their illegal, unfair, and/or deceptive acts.

83.    By reason of the foregoing, the claims of Plaintiffs and the Classes are timely under any applicable statute of limitations, pursuant to the discovery rule, the equitable tolling doctrine, and fraudulent concealment.

## CLASS ALLEGATIONS

84.    Plaintiffs, individually and on behalf of all others, bring this class action pursuant to Fed. R. Civ. P. 23.

85.    Plaintiffs seeks to represent a class defined as:

> All persons who purchased one or more of Defendant's Products in the United States for personal or household use within any applicable limitations period ("Nationwide Class").

86.    Plaintiffs also seeks to represent a subclass defined as:

> All persons who purchased one or more of Defendant's Products in California for personal or household use within any applicable limitations period ("California Subclass").

87.    Excluded from the Class and Subclass are: (1) any Judge or Magistrate presiding over this action and any members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entities in which Defendant or its parents and any entities in which Defendant has a controlling interest and its current or former employees, officers, and directors; and (3) individuals who allege personal bodily injury resulting from the use of the Products.

88.    Plaintiffs reserve the right to modify, change, or expand the definitions of the Class and/or Subclass based upon discovery and further investigation.

89.    *Numerosity*: The Class is so numerous that joinder of all members is impracticable. The Class likely contains thousands of members based on publicly available data. The Class is ascertainable by records in Defendant's possession.

90.    *Commonality*: Questions of law or fact common to the Class include, without limitation:

- Whether the Products can alleviate nasal congestion;
- Whether a reasonable consumer would consider the Products' inability to alleviate nasal congestion to be material;
- Whether Defendant knew or should have known that the Products do not have the ability to alleviate nasal congestion;
- Whether Defendant misrepresented whether the Products can alleviate nasal congestion;
- Whether Defendant failed to disclose that the Products do not have the ability to alleviate nasal congestion;
- Whether Defendant concealed that the Products do not have the ability to alleviate nasal congestion;
- Whether Defendant engaged in unfair or deceptive trade practices;
- Whether Defendant violated the state consumer protection statutes alleged herein;
- Whether Defendant was unjustly enriched; and
- Whether Plaintiffs and Class members are entitled to damages.

91.    *Typicality*: Plaintiffs' claims are typical of the claims of Class members. Plaintiffs and Class members were injured and suffered damages in substantially the same manner, have the same claims against Defendant relating to the same course of conduct, and are entitled to relief under the same legal theories.

92.    *Adequacy*: Plaintiffs will fairly and adequately protect the interests of the Class and have no interests antagonistic to those of the Class. Plaintiffs have retained counsel experienced in

1  the prosecution of complex class actions, including actions with issues, claims, and defenses like the

2  present case. Counsel intends to vigorously prosecute this action.

3       93.    *Predominance and superiority*: Questions of law or fact common to Class members

4  predominate over any questions affecting individual members. A class action is superior to other

5  available methods for the fair and efficient adjudication of this case because individual joinder of all

6  Class members is impracticable and the amount at issue for each Class member would not justify

7  the cost of litigating individual claims. Should individual Class members be required to bring

8  separate actions, this Court would be confronted with a multiplicity of lawsuits burdening the court

9  system while also creating the risk of inconsistent rulings and contradictory judgments. In contrast

10  to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and

11  expense to all parties and the court system, this class action presents far fewer management

12  difficulties while providing unitary adjudication, economies of scale and comprehensive supervision

13  by a single court. Plaintiffs are unaware of any difficulties that are likely to be encountered in the

14  management of this action that would preclude its maintenance as a class action.

15       94.    Therefore, this class action may be maintained pursuant to Fed. R. Civ. P. 23(b)(3).

16

17  **COUNT I**
**VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW ("UCL")**
**Cal. Bus. & Prof. Code § 17200, *et seq.***

18  **(On behalf of Plaintiffs and the California Subclass)**

19       95.    Plaintiffs repeat and reallege every allegation contained in the foregoing paragraphs

20  as if fully set forth herein.

21       96.    Plaintiffs bring this Count on behalf of themselves and the California Subclass

22  against Defendant.

23       97.    The UCL prohibits any "unlawful, unfair or fraudulent business act or practice and

24  unfair, deceptive, untrue or misleading advertising…." Cal. Bus. & Prof. Code § 17200.

25

26

27

28

***Fraudulent Acts and Practices***

98.    Any business act or practice that is likely to deceive members of the public constitutes a fraudulent business act or practice under the UCL. Similarly, any advertising that is deceptive, untrue, or misleading constitutes a fraudulent business act or practice under the UCL.

99.    Defendant has engaged in conduct that is likely to deceive members of the public. This conduct includes representing on its Products' labels that its Products can alleviate nasal congestion.

100.    As alleged above, Defendant has engaged in deceptive, untrue, and misleading advertising by making representations regarding the quality of the Products and material omissions regarding the Products' ability to alleviate nasal congestion.

101.    Plaintiffs and the putative Class members were exposed to one or more of these representations and/or omissions during the class period and relied on one or more of these representations and/or omissions in deciding to purchase Defendant's Products. Indeed, although the Products were found to not have the ability to alleviate nasal congestion, Defendant makes representations on the Products' packaging and labels to the contrary. Again, such misrepresentations and omissions mislead consumers regarding the quality of the Products.

102.    By committing the acts alleged above, Defendant has engaged in fraudulent business acts and practices, which constitute unfair competition within the meaning of Business & Professions Code §17200.

***Unlawful Acts and Practices***

103.    The violation of any law constitutes an unlawful business practice under Business & Professions Code §17200.

104.    Defendant's conduct also violates Cal. Health & Safety Code § 111730, which prohibits the sale of any misbranded product. By selling Products that do not accurately reflect the quality of the Products, the labeling is "false and misleading in any particular" in violation of Health & Safety Code § 111730.

105.    By violating Cal. Health and Safety Code § 111730, Defendant has engaged in unlawful business acts and practices which constitute unfair competition within the meaning of Cal.

1    Bus. & Prof. Code § 17200.

2                              ***Unfair Acts and Practices***

3         106.    Any business practice that offends an established public policy or is immoral,

4    unethical, oppressive, unscrupulous, or substantially injurious to consumers constitutes an "unfair"

5    practice under the UCL.

6         107.    Defendant has engaged in unfair business practices. This conduct includes

7    representing that the Products can alleviate nasal congestion.

8         108.    Defendant has engaged in conduct that violates the legislatively declared policies of

9    the FTC Act against committing unfair methods of competition and unfair or deceptive acts or

10   practices in or affecting commerce. Defendant gained an unfair advantage over its competitors,

11   whose advertising for products must comply with the FTC Act.

12        109.    Defendant's conduct, including misrepresenting the qualities of the Products, is

13   substantially injurious to consumers. Plaintiffs and the Class would not have paid for nasal

14   decongestant products that do not have the ability to alleviate nasal congestion but for Defendant's

15   false labeling, advertising, and promotion. Thus, Plaintiffs and the putative Class have "lost money

16   or property" as required for UCL standing, and such an injury is not outweighed by any

17   countervailing benefits to consumers or competition.

18        110.    Indeed, no benefit to consumers or competition results from Defendant's conduct.

19   Since consumers reasonably rely on Defendant's representation of the qualities described in the

20   Products' labels and injury resulted from ordinary use of the Products, consumers could not have

21   reasonably avoided such injury.

22        111.    By committing the acts described above, Defendant has engaged in unfair business

23   acts and practices which constitute unfair competition within the meaning of the UCL.

24        112.    As a result of the conduct described above, Defendant has been unjustly enriched at

25   the expense of the Plaintiffs and the putative Class.

26        113.    An action for restitution is specifically authorized under Cal. Bus. & Prof. Code

27   17203.

28

114.    Wherefore, Plaintiffs pray for judgment against Defendant, as set forth hereafter. Defendant's conduct with respect to the labeling, advertising, marketing, and sale of the Products is unfair because Defendant's conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers and the utility of its conduct, if any, does not outweigh the gravity of the harm to its victims.

115.    On behalf of Plaintiffs and the putative Class, Plaintiffs seeks an order for the restitution of all monies spent on the Products, which were acquired through acts of fraudulent, unfair, or unlawful competition. In addition, because the Products admittedly do not have the ability to alleviate nasal congestion, the measure of restitution should be rescission and full refund insofar as the Products are worthless. But for Defendant's misrepresentations and omissions, Plaintiffs would have paid nothing for Products that do not have the ability to alleviate nasal congestion. Indeed, there is no discernible "market" for an OTC nasal decongestant that does not have the ability to alleviate nasal congestion. As a result, the Products are rendered valueless.

116.    Plaintiffs and California Subclass Members have no adequate remedy at law for their claims. Plaintiffs plead their claims for equitable relief in the alternative, which inherently would necessitate a finding of no adequate remedy at law.

117.    Alternatively, legal remedies available to Plaintiffs are inadequate because they are not "equally prompt and certain and in other ways efficient" as equitable relief. *American Life Ins. Co. v. Stewart*, 300 U.S. 203, 214 (1937); *see also United States v. Bluitt*, 815 F. Supp. 1314, 1317 (N.D. Cal. Oct. 6, 1992) ("The mere existence' of a possible legal remedy is not sufficient to warrant denial of equitable relief."); *Quist v. Empire Water Co.*, 2014 Cal. 646, 643 (1928) ("The mere fact that there may be a remedy at law does not oust the jurisdiction of a court of equity. To have this effect, the remedy must also be speedy, adequate, and efficacious to the end in view … It must reach the whole mischief and secure the whole right of the party in a perfect manner at the present time and not in the future.").

/ / /

/ / /

/ / /

1

2  **COUNT II**
   **VIOLATIONS OF THE CALIFORNIA FALSE ADVERTISING LAW**
   **Cal. Bus. & Prof. Code § 17500,** *et seq.*
3  **(On behalf of Plaintiffs and the California Subclass)**

4    118. Plaintiffs repeat and reallege every allegation contained in the foregoing paragraphs

5  as if fully set forth herein.

6    119. Plaintiffs bring this Count on behalf of themselves and the California Subclass

7  against Defendant.

8    120. California's False Advertising Law prohibits any statement in connection with the

9  sale of goods "which is untrue or misleading." Cal. Bus. & Prof. Code §17500.

10   121. As set forth herein, Defendant's marketing claims that its Products can provide relief

11 to "Sinus Pressure," "Sinus Congestion," "Nasal Congestion," and/or "Nasal Swelling," are untrue

12 and misleading. To the contrary, the Products do not have the ability to alleviate nasal congestion.

13   122. Defendant knew, or reasonably should have known, that its claims regarding the

14 quality of its Products and/or omissions regarding the Products' inability to alleviate nasal

15 congestion were untrue or misleading.

16   123. Plaintiffs and members of the California Subclass are entitled to monetary relief, and

17 restitution in the amount they spent on the Products.

18   124. Plaintiffs and California Subclass Members have no adequate remedy at law for their

19 claims. Plaintiffs plead their claims for equitable relief in the alternative, which inherently would

20 necessitate a finding of no adequate remedy at law.

21   125. Alternatively, legal remedies available to Plaintiffs are inadequate because they are

22 not "equally prompt and certain and in other ways efficient" as equitable relief. *American Life Ins.*

23 *Co. v. Stewart*, 300 U.S. 203, 214 (1937); *see also United States v. Bluitt*, 815 F. Supp. 1314, 1317

24 (N.D. Cal. Oct. 6, 1992) ("The mere existence' of a possible legal remedy is not sufficient to

25 warrant denial of equitable relief."); *Quist v. Empire Water Co.*, 2014 Cal. 646, 643 (1928) ("The

26 mere fact that there may be a remedy at law does not oust the jurisdiction of a court of equity. To

27 have this effect, the remedy must also be speedy, adequate, and efficacious to the end in view … It

28 must reach the whole mischief and secure the whole right of the party in a perfect manner at the

present time and not in the future.").

**COUNT III**
**VIOLATIONS OF THE CALIFORNIA CONSUMERS LEGAL REMEDIES ACT**
**Cal. Bus. & Prof. Code § 1750, *et seq.***
**(On behalf of Plaintiffs and the California Subclass)**

126.     Plaintiffs repeat and reallege every allegation contained in the foregoing paragraphs as if fully set forth herein.

127.     Plaintiffs bring this Count on behalf of themselves and the California Subclass against Defendant.

128.     Defendant has employed or committed methods, acts, or practices declared unlawful by Cal. Civ. Code §1770 in connection with the Products.

129.     In particular, by failing to inform consumers that the Products do not have the ability to alleviate nasal congestion, Defendant has violated the following provisions under California Civil Code § 1770(a):

> (5) by representing that the Products have characteristics, uses and/or benefits which they do not;
>
> (7) by representing that the Products were of a particular standard, quality, or grade which they are not; and
>
> (9) by advertising the Products with intent not to sell them as advertised.

130.     Plaintiffs and the putative Class are not presently seeking monetary damages under the CLRA. Plaintiffs reserve the right to request amendment of this complaint to include a request for damages under the CLRA after complying with Civil Code 1782(a).

131.     Plaintiffs and California Subclass Members have no adequate remedy at law for their claims. Plaintiffs plead their claims for equitable relief in the alternative, which inherently would necessitate a finding of no adequate remedy at law.

132.     Alternatively, legal remedies available to Plaintiffs are inadequate because they are not "equally prompt and certain and in other ways efficient" as equitable relief. *American Life Ins. Co. v. Stewart*, 300 U.S. 203, 214 (1937); *see also United States v. Bluitt*, 815 F. Supp. 1314, 1317 (N.D. Cal. Oct. 6, 1992) ("The mere existence' of a possible legal remedy is not sufficient to warrant denial of equitable relief."); *Quist v. Empire Water Co.*, 2014 Cal. 646, 643 (1928) ("The

1   mere fact that there may be a remedy at law does not oust the jurisdiction of a court of equity. To

2   have this effect, the remedy must also be speedy, adequate, and efficacious to the end in view … It

3   must reach the whole mischief and secure the whole right of the party in a perfect manner at the

4   present time and not in the future.").

5                                          **COUNT IV**
                          **BREACH OF EXPRESS WARRANTY OF MERCHANTABILITY**
6                   **(On behalf of Plaintiffs, the California Subclass, and the Nationwide Class)**

7        133.    Plaintiffs repeat and reallege every allegation contained in the foregoing paragraphs

8   as if fully set forth herein.

9        134.    Plaintiffs bring this Count on behalf of themselves, the California Subclass, and the

10  Nationwide Class against Defendant.

11       135.    At all times relevant, all fifty States and the District of Columbia and Puerto Rico

12  have codified and adopted the provisions of the Uniform Commercial Code governing the express

13  warranty of merchantability and fitness for ordinary purpose.

14       136.    Plaintiffs, and each member of the California Subclass and the Nationwide Class,

15  formed a contract with Defendant at the time Plaintiffs and the other members of the California

16  Subclass and the Nationwide Class purchased Defendant's phenylephrine products. The terms of

17  that contract include the nasal decongestive promises and affirmations of fact made by Defendant

18  on its phenylephrine products' labels and packages as described above. These representations

19  constitute express warranties, became part of the basis of the bargain, and are part of a standardized

20  contract between Plaintiffs and the other members of the California Subclass and the Nationwide

21  Class on the one hand, and Defendant on the other.

22       137.    All conditions precedent to Defendant's liability under this contract have been

23  performed by Plaintiffs and the other members of the California Subclass and the Nationwide Class.

24       138.    At all relevant times, Defendant had the duty and obligation to truthfully represent to

25  Plaintiffs the facts concerning the ineffectiveness of phenylephrine and its phenylephrine products.

26  Instead, Defendant aggressively and falsely marketed and advertised the effectiveness of

27  phenylephrine and its phenylephrine products, despite the fact that Defendant knew that

28  phenylephrine and its phenylephrine products were entirely ineffective against the nasal congestion

1    its phenylephrine products were marketed and advertised to treat.

2        139.    Defendant breached the terms of this contract, including the express warranties, with

3    Plaintiffs and the other members of the California Subclass and the Nationwide Class by not

4    providing the phenylephrine products that could provide the nasal decongestive benefits as

5    represented and described above.

6        140.    As a result of Defendant's breach of its warranty, Plaintiffs and the other members of

7    the California Subclass and the Nationwide Class have been damaged in the amount of the purchase

8    price of the phenylephrine products they purchased.

9                                     **COUNT V**
                        **BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
10              **(On behalf of Plaintiffs, the California Subclass, and the Nationwide Class)**

11        141.    Plaintiffs repeat and reallege every allegation contained in the foregoing paragraphs

12    as if fully set forth herein.

13        142.    Plaintiffs bring this Count on behalf of themselves, the California Subclass, and the

14    Nationwide Class against Defendant.

15        143.    At all times relevant all fifty States and the District of Columbia and Puerto Rico

16    have codified and adopted the provisions of the Uniform Commercial Code governing the implied

17    warranty of merchantability and fitness for ordinary purpose.

18        144.    The Uniform Commercial Code §2-314 provides that unless excluded or modified, a

19    warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a

20    merchant with respect to goods of that kind. This implied warranty of merchantability acts as a

21    guarantee by the seller that his goods are fit for the ordinary purposes for which they are to be used.

22        145.    The Uniform Commercial Code §2-314 provides that "[g]oods to be merchantable

23    must be at least such as…. Are adequately contained, packaged, and labeled as the agreement may

24    require…[and] conform to the promises or affirmations of fact made on the container or label if

25    any." Cal.Com.Code § 2314(2)(f).

26        146.    Defendant was always a "merchant" within the meaning of Article 2 of the U.C.C.,

27    as codified under applicable law.

28

147.    The Products are and were goods within the meaning of Article 2 of the U.C.C., as codified under applicable law.

148.    Defendant was obligated to provide Plaintiffs and the other Class Members Products that were of merchantable quality, were reasonably fit for the purpose for which they were sold and confirmed to the standards of the trade.

149.    Defendant impliedly warranted that those drugs were of merchantable quality and fit for that purpose.

150.    Defendant breached its implied warranties, because the Products were not of merchantable quality or fit for their ordinary purpose.

151.    Defendant's breaches of implied warranties were a direct and proximate cause of Plaintiffs' and the other Class members' damages.

**COUNT VI**
**UNJUST ENRICHMENT**
**(On behalf of Plaintiffs, the California Subclass, and the Nationwide Class)**

152.    Plaintiffs repeat and reallege every allegation contained in the foregoing paragraphs as if fully set forth herein.

153.    Plaintiffs bring this Count on behalf of themselves, the California Subclass, and the Nationwide Class against Defendant.

154.    The claim is brought under the laws of the State of California.

155.    Defendant's conduct violated, inter alia, state and federal law by manufacturing, advertising, marketing, and selling the Products while misrepresenting and omitting material facts.

156.    Defendant's unlawful conduct allowed Defendant to knowingly realize substantial revenues from selling the Products at the expense of, and to the detriment or impoverishment of, Plaintiffs and Class members and to Defendant's benefit and enrichment. Defendant has thereby violated fundamental principles of justice, equity, and good conscience.

157.    Plaintiffs and Class members conferred significant financial benefits and paid substantial compensation to Defendant for the Products, which were not as Defendant represented them to be.

158.    Defendant knowingly received and enjoyed the benefits conferred on it by Plaintiffs

1    and Class members.

2    159.    It is inequitable for Defendant to retain the benefits conferred by Plaintiffs and Class

3    members' overpayments.

4    160.    Plaintiffs and Class members seek establishment of a constructive trust from which

5    Plaintiffs and Class members may seek restitution.

6                                    **COUNT VII**
                            **FRAUDULENT MISREPRESENTATION**
7        **(On behalf of Plaintiffs, the California Subclass, and the Nationwide Class)**

8    161.    Plaintiffs repeat and reallege every allegation contained in the foregoing paragraphs

9    as if fully set forth herein.

10    162.    Plaintiffs bring this Count on behalf of themselves, the California Subclass, and the

11    Nationwide Class against Defendant.

12    163.    At all relevant times, Defendant had the duty and obligation to truthfully represent to

13    Plaintiffs the facts concerning the ineffectiveness of phenylephrine and its phenylephrine products.

14    Instead, Defendant aggressively and falsely marketed and advertised the effectiveness of

15    phenylephrine and its phenylephrine products, despite the fact that Defendant knew, or should have

16    known, that phenylephrine and its phenylephrine products were entirely ineffective against the nasal

17    decongestion its phenylephrine products were marketed and advertised to treat.

18    164.    At all relevant times, at locations including, but not limited to, Defendant's retail

19    stores and online platforms, Defendant actively marketed and sold its phenylephrine products with

20    labels, advertisements, and promotional materials that prominently represented its phenylephrine

21    products as effective remedies for "Sinus Pressure," "Sinus Congestion," "Nasal Congestion,"

22    "Nasal Swelling," or otherwise effective for relieving nasal congestion.

23    165.    Defendant willfully deceived Plaintiffs and the public in general by making these

24    intentional misrepresentations regarding the effectiveness of phenylephrine and its phenylephrine

25    products notwithstanding its knowledge that phenylephrine is ineffective as a nasal decongestant.

26    166.    At the time the aforesaid misrepresentations were made, Defendant intended to

27    induce Plaintiffs to rely upon such misrepresentations. Defendant continued to promote and sell its

28    phenylephrine products to Plaintiffs and the public in general. Defendant's intent was clear: to

1     induce sales based on false claims regarding the effectiveness of its phenylephrine products.

2         167.    At the time Defendant made the aforesaid misrepresentations, Plaintiffs and the

3     public in general reasonably believed them to be true. In reasonable and justified reliance upon said

4     misrepresentations, Plaintiffs purchased Defendant's phenylephrine products.

5         168.    As a direct and proximate result of Defendant's deceptive marketing and sales

6     practices, Plaintiffs suffered financial losses, having spent money on Defendant's phenylephrine

7     products that did not deliver on their promised benefits, and suffered worse health symptoms due to

8     receiving ineffective treatment.

9
10

**COUNT VIII**
**NEGLIGENT MISREPRESENTATION**
**(On behalf of Plaintiffs, the California Subclass, and the Nationwide Class)**

11         169.    Plaintiffs repeat and reallege every allegation contained in the foregoing paragraphs

12     as if fully set forth herein.

13         170.    Plaintiffs bring this Count on behalf of themselves, the California Subclass, and the

14     Nationwide Class against Defendant.

15         171.    At the time Defendant made these representations, Defendant knew or should have

16     known that these representations were false or made them without knowledge of their truth or

17     veracity.

18         172.    In making representations of fact to Plaintiffs and the members of the California and

19     Nationwide Classes about the Products, Defendant failed to fulfill its duty to disclose the material

20     facts alleged above. Such failure to disclose on the part of Defendant amounts to negligent

21     misrepresentation.

22         173.    At an absolute minimum, Defendant negligently misrepresented and/or negligently

23     omitted material facts about the Products.

24         174.    The negligent misrepresentations and omissions made by Defendant, upon which

25     Plaintiffs and Class members reasonably and justifiably relied, were intended to induce, and

26     induced Plaintiffs and Class members to purchase the Product.

27         175.    Plaintiffs and Class members would not have purchased the Product or would not

28     have purchased the products on the same terms if the true facts had been known.

176.    Plaintiffs and the other members of the California and Nationwide Classes, as a direct and proximate cause of Defendant's negligent misrepresentations, reasonably relied upon such misrepresentations to their detriment. By reason thereof, Plaintiffs and the other Class members have suffered damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, prays for relief and judgment against Defendant as follows:

- Certifying the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiffs as representatives of the Class and Subclasses, and designating Plaintiffs' counsel as Class Counsel;

- Awarding Plaintiffs and Class members compensatory damages, in an amount to be determined at trial;

- Awarding Plaintiffs and Class members appropriate relief, including but not limited to actual damages;

- For restitution and disgorgement of profits;

- Awarding Plaintiffs and Class members reasonable attorneys' fees and costs as allowable by law;

- Awarding pre-judgment and post-judgment interest;

- For punitive damages; and

- Granting any other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial on all issues so triable as of right.

Dated:  October 24, 2023                          Respectfully submitted,

KERSHAW TALLEY BARLOW PC


_/s/ William A. Kershaw_____
William A. Kershaw (SBN 57486)
401 Watt Avenue, Suite 1
Sacramento, CA 95864
Phone: 916-779-7000
Fax: 916-244-4829
Email: bill@kctlegal.com

FLEMING, NOLEN & JEZ, LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

George M. Fleming (Pro Hac Vice forthcoming)
Texas State Bar No. 07123000
Rand P. Nolen (Pro Hac Vice forthcoming)
Texas State Bar No. 00788126
Barrett W. Beck (Pro Hac Vice forthcoming)
Texas State Bar No. 24103837
2800 Post Oak Blvd., Suite 4000
Houston, TX 77056
Phone: 713-621-7944
Fax: 713-621-9638
george_fleming@fleming-law.com
rand_nolen@fleming-law.com
barrett_beck@fleming-law.com

*Counsel for Plaintiffs*

1

2

## DECLARATION OF WILLIAM A. KERSHAW

## PURSUANT TO CALIFORNIA CIVIL CODE § 1780(d)

3  I, William A. Kershaw, declare as follows:

4      1.      I submit this declaration pursuant to section 1780(d) of the California Consumers

5  Legal Remedies Act. I have personal knowledge of the matters set forth below and if called as a

6  witness could and would be competent to testify thereto.

7      2.      Defendants Walmart, Inc. is an Arkansas corporation with their principal place of

8  business in Arkansas. Defendant was engaged in the business of sales, marketing, and distribution

9  of its phenylephrine products in California, and throughout the United States of America.

10      I declare under the penalty of perjury under the laws of the State of California and the

11  United States that the foregoing is true and correct and that this declaration was executed on

12  October 24, 2023 in Sacramento, California.

13

14

*/s/ William A. Kershaw*
WILLIAM A. KERSHAW

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT